In re ELLETSON CO.

(District Court, N. D. West Virginia. January 6, 1912.)

1. BANKRUPTCY (§ 340*)—CLAIMS—NATURE OF INDEBTEDNESS—EVIDENCE.
    Evidence *held* to require a finding that a balance due on a debt to claimant bank was the debt of the bankrupt corporation, and that the bankrupt was not a mere accommodation indorser for one of its promoters.

    [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 340.*]

2. BANKRUPTCY (§ 316*)—CLAIMS—RIGHTS OF INDORSER.
    A bankrupt corporation and another executed a joint negotiable note payable to the order of C., who indorsed it to claimant bank for its face value in cash less the discount. The corporation acknowledged the debt to be its own and sought to secure it by a deed of trust on its property at a time when its joint maker was engaged in no other business, except managing the corporation's affairs, and when it was purchasing new stock and material. *Held,* that such note was prima facie the obligation of the corporation, and C., being liable to the bank on

his indorsement thereof, was entitled to file claims against the corporation's assets in bankruptcy thereon.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 316.*]

**3. BANKRUPTCY (§ 312*)—PREFERENCES—VOID SECURITY.**

Where a bankrupt corporation, owing certain valid debts to a bank, executed two deeds of trust to secure an indorser on the notes evidencing the debts, and the deeds of trust were thereafter held to be fraudulent and void, the fact that the bank unsuccessfully asserted a preference based on such deeds did not, in the absence of bad faith, preclude the bank from proving its debts as unsecured claims against the bankrupt's assets.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 312.*]

In the matter of bankruptcy proceedings of the Elletson Company. On petition to revise an order denying the application of the Ritchie County Bank for the allowance of a claim against the bankrupt's estate. Reversed.

Robinson & Prunty and Dorr Casto, for Ritchie County Bank.

Smith D. Turner, John Marshall, Merrick & Smith, and Reese Blizzard, for trustee and creditors.

DAYTON, District Judge. I have filed one opinion in this case (174 Fed. 859, affirmed in Ritchie County Bank v. McFarland, 183 Fed. 715, 106 C. C. A. 153), wherein the facts are fully set forth. The point there decided was that one of the deeds of trust relied upon by the bank to constitute its debt a preferred one was fraudulent and void. The bank now seeks to prove its debt as an unsecured one to which objections have been made by the trustee, and these have been sustained by the referee, and the bank has filed this petition to revise. The referee, as shown by a very full and able written opinion filed by him, bases his ruling upon a finding that the bank's debt is not that of the bankrupt, but of Elletson personally, indorsed without consideration by the bankrupt, which indorsement was not warranted by law.

[1, 2] This finding may be briefly stated to be that Elletson owned the printing plant, sold a half interest to Carver for $12,000, received from him $5,000, then bought it back for the same price, secured the charter of the Elletson-Carver Company, sold the plant to it as a whole, receiving from it in full payment therefor all the corporation's stock except the five shares required to be subscribed in order to procure its charter, and then procured the company to execute five notes aggregating $12,000 payable to his order which he indorsed and turned over to Carver in payment of his personal debt to him. Touching this finding, however, it is to be noted that the original sale of Elletson to Carver of the half interest was made in December, 1904, the corporation was chartered January 11, 1905, the sale of the plant to it by Elletson was on January 20, 1905, and on February 15, 1905, the five notes, four for $2,500 each, the fifth for $2,000, were executed by the company under express authorization of both its stockholders and directors, made payable to Elletson's order, by him indorsed and turned over to Carver, who turned them over to the petitioning bank on the next day, where they were discounted, and the proceeds placed to the credit of the corporation itself, not that of Elletson; that at

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

this time the company (not Elletson) was indebted to this bank $3,600 on account of its overdrafts. This sum it seems clear was at once paid out of the proceeds of these notes, as, I doubt not, was the $5,000 owing from Elletson to Carver primarily for the repurchase of his half interest, and the residue of the $4,000, less the discount, was placed to the credit of the corporation, and was by it subsequently drawn out and expended in the course of its business. Thus it will be seen that all of this $12,000 debt, except $5,000, was primarily, so far as the bank is concerned, the debt of the corporation, for which the bank would be clearly entitled to recover from it. Whether the company having paid it would be entitled to obtain reimbursement from Elletson is another question. As to the $5,000 which Carver doubtless received in payment of his debt against Elletson, it is to be noted that two of these notes and part of another have been repaid the bank, whether by the company or by Elletson or Carver is not disclosed, and that only about $6,400 with its interest of this $12,000 debt is now claimed by the bank, a sum less than the amount which the company directly received and was primarily responsible for. But, independent of all this, it is not unreasonable to conclude, in view of the direct acknowledgment by both the stockholders and directors of this $12,000 debt, that, when Elletson sold the plant to the company, a part of the consideration was that the company should pay the amount due from him to Carver in addition to the 495 shares of stock, and have the residue of the $12,000 as working capital necessary to pay existing debts, and for necessary additions to stock and machinery. It is clear that, after Carver sold back to Elletson his half interest, the corporation was only formed as a means of operation. So far as disclosed, Elletson did not seek to sell the stock sold to him. This stock was of equivocal value. It is clear that the other four stockholders subscribed only the nominal sum necessary to form the corporation, and that it was nothing in effect but a scheme whereby Elletson contributing the plant might pay its debt and secure working capital. I therefore am compelled to disagree with this finding of the referee to the effect that this $6,400 balance of the $12,000 debt was not the debt of the corporation, and that it was only an accommodation indorser therefor of Elletson. The $3,500 balance of the debt with its interest, claimed by the bank, stands upon an entirely different footing. There can be no doubt from the evidence that more than three years after the first notes were discounted by the bank Elletson and the corporation executed a joint negotiable note payable to the order of Carver who indorsed it over to the bank for its face value in cash less the discount. As the company acknowledged this debt to be its own and sought to secure it by deed of trust upon its property, and as Elletson was engaged in no other business apparently at the time save and except the management of this company's affairs, and as the company was purchasing new stock and material, there can be little doubt of its having received the benefit of the proceeds of this note and of its primary responsibility therefor. Carver indorsed this note to the bank, and, as such indorser, became liable to the bank therefor, and incidentally was entitled to file proof of claim for it.

[3] But a much more serious and perplexing question is involved here. Has the bank by asserting a preference based upon the two deeds of trust executed by the company to secure these debts to Carver which have been held herein fraudulent and void by reason of section 57g of the bankrupt act of July 1, 1898, c. 541, 30 Stat. 560 (U. S. Comp. St. 1901, p. 3443), which declares "the claims of creditors who have received preference shall not be allowed unless such creditors shall surrender their preferences" precluded itself from having these debts allowed as unsecured ones?

In considering this question a distinction is to be recognized, it seems to me, between a fraudulent and void debt and a fraudulent and void conveyance executed to secure a valid debt. Generally speaking in the first instance no remedy is afforded the creditor to collect the debt. In the second instance, under the laws of this state, the valid debt by reason of the taking of a fraudulent conveyance to secure it will not be denied payment, but will be postponed in payment to at least all debts existing at the time of such fraudulent conveyance. The bankruptcy act recognizes no principle whereby a valid debt may be postponed in payment of another, both being unsecured, for "the primary object of the bankrupt law is to secure the equal distribution of the property of the bankrupt of every kind among his creditors." Trimble v. Woodhead, 102 U. S. 647, 650, 26 L. Ed. 290; In re Hurst (D. C.) 188 Fed. 707.

In two cases from Illinois, where the common law allowing preferences prevails except as controlled by a voluntary assignment act similar to the one existing in this state, the Supreme Court held that a creditor who attempts to secure to himself an illegal preference of his debt is not thereby debarred under the operation of such assignment act from participating in a distribution of all the debtor's property, including that thus illegally conveyed to him. White v. Cotzhausen, 129 U. S. 329, 9 Sup. Ct. 309, 32 L. Ed. 677; U. S. Rubber Co. v. American Oak Leather Co., 181 U. S. 434, 21 Sup. Ct. 670, 45 L. Ed. 938. In Streeter v. Jefferson County Bank, 147 U. S. 36, 13 Sup. Ct. 236, 37 L. Ed. 68, the same court, in construing the provisions of the bankrupt act of 1867 (Act March 2, 1867, c. 176, § 39, 14 Stat. 517), as amended by the act of June 22, 1874 (18 Stat. 178, 180, c. 390, § 12), has held that a creditor having secured an illegal preference was not thereby precluded from proving his debt as an unsecured one after the preference had been set aside.

In Keppel v. Tiffin Savings Bank, 197 U. S. 356, 25 Sup. Ct. 443, 49 L. Ed. 790, the same court has substantially, it seems to me, laid down the principles that must govern here. It is true that these principles are affirmed by a bare majority of the justices, but this is sufficient to bind subordinate courts. In that case the question propounded by the Circuit Court of Appeals was:

"Can a creditor of a bankrupt, who has received a merely voidable preference, and who has in good faith retained such preference until deprived thereof by the judgment of a court upon a suit of the trustee, thereafter prove the debt so voidably preferred?"

The answer to this question was in the affirmative. Chief Justice Fuller, speaking for the majority and discussing section 57g of the present bankruptcy act, says:

"We think it clear that the fundamental purpose of the provision in question was to secure an equality of distribution of the assets of a bankrupt estate. This must be the case, since, if a creditor, having a preference, retained the preference, and at the same time proved his debt and participated in the distribution of the estate, an advantage would be secured not contemplated by the law. Equality of distribution being the purpose intended to be effected by the provision, to interpret it as forbidding a creditor from proving his claim after a surrender of his preference, because such surrender was not voluntary, would frustrate the object of the provision, since it would give the bankrupt estate the benefit of the surrender or cancellation of the preference, and yet deprive the creditor of any right to participate, thus creating an inequality. But it is said, although this be true, as the statute is plain, its terms cannot be disregarded by allowing that to be done which it expressly forbids. This rests upon the assumption that the word 'surrender' necessarily implies only voluntary actions, and hence excludes the right to prove where the surrender is the result of a recovery compelled by judgment or decree. The word 'surrender,' however, does not exclude compelled action, but, to the contrary, generally implies such action. That this is the primary and commonly accepted meaning of the word is shown by the dictionaries. Thus the Standard Dictionary defines its meaning as follows: (1) To yield possession of to another · upon compulsion or demand, or under pressure of a superior force; give up, especially to an enemy in warfare; as to 'surrender' an army or a fort. And in Webster's International Dictionary the word is primarily defined in the same way. The word, of course, also sometimes denotes voluntary action. In the statute, however, it is unqualified, and generic, and hence embraces both meanings. The construction which would exclude the primary · meaning so as to cause the word only to embrace voluntary action would read into the statute a qualification, and this in order to cause the provision to be in conflict with the purpose which it was intended to accomplish—equality among creditors. But the construction would do more. It would exclude the natural meaning of the word used in the statute in order to create a penalty, although nowhere expressly or even by clear implication found in the statute. This would disregard the elementary rule that a penalty is not to be readily implied, and, on the contrary, that a person or corporation is not to be subjected to a penalty unless the words of the statute plainly impose it. Tiffany v. National Bank of Missouri, 18 Wall. 409, 410 [21 L. Ed. 862]. If it had been contemplated that the word 'surrender' should entail upon every creditor the loss of power to prove his claims if he submitted his right to retain an asserted preference to the courts for decision, such purpose could have found ready expression by qualifying the word 'surrender' so as to plainly convey such meaning. Indeed, the construction which would read in the qualification would not only create a penalty alone by judicial action, but would necessitate judicial legislation in order to define what character and degree of compulsion was essential to prevent the surrender in fact from being a surrender within the meaning of the section. It is argued, however, that courts of bankruptcy are guided by equitable considerations, and should not permit a creditor who has retained a fraudulent preference until compelled by a court to surrender it to prove his debt, and thus suffer no other loss than the costs of litigation. The fallacy lies in assuming that courts have power to inflict penalties, although the law has not imposed them. Moreover, if the statute be interpreted, as it is insisted it should be, there would be no distinction between honest and fraudulent creditors, and therefore every creditor who in good faith had acquired an advantage which the law did not permit him to retain would be subjected to the forfeiture simply because he had presumed to submit his legal rights to a court for determination. And this accentuates the error in the construction, since the elementary principle is · that courts are

created to pass upon the rights of parties, and that it is the privilege of the citizen to submit his claims to the judicial tribunals, especially in the absence of malice and when acting with probable cause, without subjecting himself to penalties of an extraordinary character. The violation of this rule, which would arise from the construction, is well illustrated by this case. Here, as we have seen, it is found that the bank acted in good faith without knowledge of the insolvency of its debtor and of wrongful intent on his part, and yet it is asserted that the right to prove its lawful claims against the bankrupt estate was forfeited simply because of the election to put the trustee to proof in a court of the existence of the facts made essential by the law to an invalidation of the preference. We are of opinion that, originally considered, the surrender clause of the statute was intended simply to prevent a creditor from creating inequality in the distribution of the assets of the estate by retaining a preference and at the same time collecting dividends from the estate by the proof of his claim against it, and consequently that whenever the preference has been abandoned or yielded up, and thereby the danger of inequality has been prevented, such creditor is entitled to stand on an equal footing with other creditors and prove his claims."

Under these rulings, it seems to me, but a single question of fact remains to be determined herein. Did the bank in good faith rely upon the preferences secured by these trust deeds until this court's decree declared them void? Touching this, the evidence is clear that these deeds were made to secure Carver and not the bank, that Carver took the notes to the bank, and, by reason of his position as its cashier, directed their discount without consultation with its directors, and that the proceeds were almost immediately checked out. It is also to be observed that at the time these conveyances were made their legal status in this state was unsettled. Gilbert v. Peppers, 65 W. Va. 355, 64 S. E. 361, upon the authority of which these deeds were set aside, had not been decided, and the rulings enunciated in Conaway v. Stealey, 44 W. Va. 163, 28 S. E. 793, Horner-Gaylord Co. v. Fawcett, 50 W. Va. 487, 40 S. E. 564, 57 L. R. A. 869, and Bartles & Dillon v. Dodd, 56 W. Va. 383, 49 S. E. 414, were in accepted force. It is true the bank took no steps to enforce the trusts, although their notes had gone to protest and were long overdue. A presumption perhaps could be drawn from this fact that the bank was seeking like Carver and Elletson to hinder and delay creditors, but this presumption alone does not seem to me to be strong enough to fasten the charge of bad faith upon the bank. Other reasonable presumptions may be inferred, accounting for this delay. It seems to me inevitable that the decree of the referee complained of must be reversed and the bank be allowed to participate pro rata with other unsecured creditors of the bankrupt, and it will be so ordered.