HUNTINGTON NAT. BANK v. HUNTINGTON DISTILLING CO. et al.

(Circuit Court, S. D. West Virginia. March 5, 1907.)

1. LIMITATION OF ACTIONS—PLEADING BAR—EQUITY.

Not merely the defense of laches, but the bar of the statute against a suit for an accounting by an administratrix for money which went into the hands of intestate, R., is sufficiently pleaded by an answer alleging that if there had ever been any claim against R. in his lifetime by reason of the alleged transactions, which is denied, said claim is barred by the lapse of time and the neglect of plaintiff to have a settlement of the same in the lifetime of decedent, and defendant therefore pleads that any such claim is barred, as plaintiff allowed the claim to sleep till after the death of deceased; the same strictness of pleading the statute not being required in equity as at law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 33, Limitation of Actions, §§ 683–686.]

2. COURTS—FEDERAL COURTS—PROCEDURE IN STATE COURTS—WITNESSES—COMPETENCY—TRANSACTIONS WITH DECEDENTS.

Notwithstanding that under the state statute persons interested in the event of the suit, though not parties thereto, are incompetent to testify to transactions or communications with defendant's intestate, they may do so in a suit in a federal court, under Rev. St. U. S. § 858 [U. S. Comp. St. 1901, p. 659], providing that in the courts of the United States no witness shall be excluded because he is a party to or interested in the issue tried; provided, that in actions by or against administrators neither party shall be allowed to testify against the other, as to transactions with, or statements by, deceased, unless called to testify thereto by the opposite party, or required to testify thereto by the court.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 925.]

3. TRUSTS—TRUSTEE DE SON TORT.

Where a company executed a paper whereby it assigned accounts and sold goods to a bank, providing that the bank should collect the one and sell the other and apply the proceeds to payment of the company's notes to the bank, and the president of the bank concealed from the bank such fact, and without authority of his co-directors took possession of the property and used the proceeds for other debts of the company, of which he was a stockholder, he constituted himself a trustee de son tort for the bank.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, §§ 153–156.]

4. LIMITATION OF ACTIONS—RUNNING OF STATUTE—OBSTRUCTING PROSECUTION OF RIGHT.

Where a company assigned accounts and sold goods to a bank to apply the proceeds on the company's notes to the bank, and the bank's president concealed such facts from it, and took possession of the property and applied the proceeds to other debts of the company, of which he was a stockholder, the statute did not, during such concealment, run against the bank's right of action for an accounting, under Code 1906, § 3511, providing that where a debtor obstructs the prosecution of a right the time of such obstruction shall not be computed in the limitation period.

5. SAME—ENFORCEMENT OF TRUST—LACHES.

Where a bank's president concealed from it the facts giving it right to have him account as a trustee de son tort, but a year after his death and the discovery of the facts it commenced suit, the defense of laches is not available.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, §§ 568–573.]

In Equity.

Simms & Enslow, for plaintiff.

Vinson & Thompson, J. W. Caperton, and James R. Bush, for defendants.

DAYTON, District Judge (sitting specially). This suit was instituted in 1905, in the Circuit Court of Cabell county, West Virginia, for two purposes: First, to compel Minerva Phelps Russell administratrix of the estate of John Hooe Russell, to account for the proceeds of the property of the Huntington Distilling Company which are alleged to have gone into his hands under a certain written assignment made by said distilling company to the plaintiff bank to secure payment of something over $9,000 debt due from it to said bank; and, second, in case these proceeds were found insufficient to pay in full said debt, then to require certain stockholders to pay any balance of said debt out of alleged unpaid stock subscriptions of theirs. The administratrix of Russell, deceased, a citizen of Kentucky, although appointed in West Virginia, removed the cause to this court, and heretofore Keller, District Judge for this district, has overruled a motion to remand, and, upon demurrer, has held the bill multifarious, and for that reason dismissed it so far as the parties interested in the payment of the stock subscriptions are concerned, but entertaining it as to the controversy between the plaintiff and Russell's administratrix as to the proceeds of the distilling company alleged to have gone into his hands. The bill sets forth in detail certain facts as to this property which will be considered more fully later on, and to it an answer has been filed by the administratrix, denying in detail its allegations, and charging plaintiff's demand against decedent's estate to be barred by lapse of time and by neglect and negligence of plaintiff in asserting it. She has also tendered and asked leave to file an amendment to this answer, specifically pleading the bar of the West Virginia statute of limitations provided by section 12, c. 104, of the Code (1906) of the state. To the filing of this amendment the plaintiff has excepted, and by stipulation of counsel it has been agreed that I shall pass upon this exception, and, in case the amendment is permitted to be filed, then an amendment to the bill is tendered and asked by the plaintiff to be filed, and a general replication also tendered. Whatever determination I may reach as to this, it is further stipulated that the cause should be submitted to and determined by me without further delay upon its merits.

It seems to me the objection to the filing of this amendment to the answer can be speedily disposed of. In my opinion it is immaterial whether it be filed or not, for, as I construe the allegations of the original answer, it sufficiently pleads this statute. It distinctly says:

"* * * If there had ever at any time been any claim or demand against the said John Hooe Russell in his lifetime by reason of said transactions (which this respondent denies), then said claim is barred by the lapse of time and the neglect and negligence of the plaintiff, its officers and directors, to have a settlement of the same in the lifetime of the decedent; and she therefore pleads that any such claim, if any there be or was, is barred and cannot now be collected out of his estate, as said officers and directors of the plaintiff and managers thereof allowed this claim and transaction to sleep until after the death of said John Hooe Russell."

152 F.—16

It seems to me clear that this language sets up the bar by statute, as well as the equitable defense of laches. "Anything in an answer which will apprise the plaintiff that the defendant relies on the statute of limitations is sufficient, if such facts are stated as are necessary to show that the statute is applicable." Tazewell's Ex'r v. Whittle's Adm'r, 13 Grat. (Va.) 329 (Syl., pt. 1).

Moncure, J., in this case further says, at page 344:

"The same strictness of pleading is not required in equity as at law. It is not common to plead the statute specially or formally in equity, but only to rely upon it, in general terms, in the answer."

This, in hæc verba, is reaffirmed in Cole's Ex'r v. Martin, 99 Va. 223, 37 S. E. 907.

In this state this freedom in practice has been greatly extended, and it is now held that it is the duty of the personal representative to rely upon the statute of limitations, and when not done in the answer, it may be relied on, and in effect pleaded, by such personal representative and by creditors as to each other's demands, by means of exception to a commissioner's report made to settle and ascertain the debts of a decedent. Woodyard v. Polsley, 14 W. Va. 211. If, therefore, as a matter of more formal pleading, the defendant desires to file this amendment to her answer, I can see no objection, and it may be filed.

Nor can I see any particular objection to the amendment of the bill asked for by the plaintiff to more fully set forth facts alleged to be sufficient to withdraw its demand without the bar of this statute, although what I have said above about the necessity for the amendment to the answer applies with equal force to the amendment asked of the bill. I regard both unnecessary, but unobjectionable.

Coming now to the merits of the case, I am met at the very threshold with a very interesting preliminary question which it seems to me should be first determined. A very large part of the testimony upon which the plaintiff rests its case has been given by officers, directors, and stockholders of the bank who are practically interested in the result of this suit, and their evidence substantially relates to transactions and communications had by them with the decedent, Russell. The counsel for defendant has in every instance, I think, and with the utmost care, preserved objection to this kind of testimony, entering objections thereto and motions to strike out, at the time when taken. Is such testimony competent? Section 23, c. 130 (section 3945) of the Code of 1906 of this state, provides:

"No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom, any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, insane or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, or survivor of such person, or the assignee or committee of such insane person or lunatic."

Under this statute, the Supreme Court of Appeals of West Virginia, without discussion, and apparently, without much consideration, but rather as a matter of course, has held, in Carskadon v. Minke, 26 W. Va. 729, that:

"In a suit to settle the affairs of an unincorporated company or a partner-ship—one of the members being dead—the surviving members are not under the statute of 1882 competent to testify as witnesses in regard to such affairs."

And in Development Co. v. Thornburg, 46 W. Va. 99, 33 S. E. 108, relying for support on the preceding case, it is held:

"Persons who are directors and stockholders of a corporation are incompetent to testify against the administrator and heirs at law of a deceased person in favor of such corporation, as to any communication or transaction had with such deceased person in their official capacity as such directors, unless such administrator and heirs at law are examined as to such communication or transaction in their own behalf or the testimony of such deceased person touching the same is given in evidence."

It is not surprising that a very considerable direct conflict should arise in the decisions of the courts of last resort of the states touching this question. For example, the Supreme Court of Appeals of Virginia has, in construing the statute of that state, ruled exactly opposite to that of the Supreme Court of this state. See Bank v. Terry's Adm'r, 99 Va. 194, 37 S. E. 843; Insurance Co. v. Oliver, 95 Va. 445, 28 S. E. 594. In Georgia the rule first laid down was that such witnesses were incompetent. Banking Co. v. Papot, 59 Ga. 342; R. R. Co. v. Papot, 67 Ga. 675. But subsequently the rule seems to have been exactly reversed. Ullman v. Brunswick T. G. & L. Co., 96 Ga. 625, 24 S. E. 409. In Illinois, Indiana, Iowa, Minnesota, New York, and Pennsylvania such witnesses have been held incompetent. Ice Machine Co. v. Keifer, 134 Ill. 481, 25 N. E. 799, 10 L. R. A. 696, 23 Am. St. Rep. 688; Modlin v. Turnpike Co., 48 Ind. 492; Bank v. Owen, 52 Iowa, 107, 2 N. W. 980; Elevator Co. v. Ins. Co., 40 Minn. 152, 41 N. W. 547; Keller v. Mfg. Co., 39 Hun (N. Y.) 348; Foster v. Collner, 107 Pa. 305. In Maryland, Michigan, Mississippi, New Jersey, and Tennessee the opposite rule prevails. Downes v. M. & D. R. Co., 37 Md. 100; Rust v. Bennett, 39 Mich. 521; Mitchell v. Sav. Inst., 56 Miss. 444; N. J. T. & S. D. Co. v. Camden S. D. & T. Co., 58 N. J. Law, 196, 33 Atl. 475; Grange Warehouse Ass'n v. Owen, 86 Tenn. 355, 7 S. W. 457. But since 1862 we have had federal legislation on this subject, which, as it remains to-day, is found in section 858 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 659], and is as follows:

"In the courts of the United States no witness shall be excluded in any action on account of color, or in any civil action because he is a party to or interested in the issue tried: Provided, That in actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other, as to any transaction with, or statement by, the testator, intestate, or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court. In all other respects, the laws of the state in which the court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States in trials at common law, and in equity and admiralty."

This statute has been held to be a remedial one, intended to remove technical disqualifications in the common-law rules of evidence and to promote the fair administration of justice, and to be liberally construed.

It is a complete abolition of the rule of exclusion under the common law in all of the courts of the United States. By it interested parties, except those named in the proviso, are placed upon a footing of equality with all other witnesses, so that they may testify for themselves and be compelled to testify for others. Goodwin v. Fox, 129 U. S. 601, 9 Sup. Ct. 367, 32 L. Ed. 805; Texas v. Chiles, 21 Wall. (U. S.) 488, 22 L. Ed. 650; U. S. v. Clark, 96 U. S. 37–42, 24 L. Ed. 696; R. R. Co. v. Pollard, 22 Wall. (U. S.) 341, 22 L. Ed. 877; Lowrey v. Kusworm (C. C.) 66 Fed. 539.

It has been further held that the competency of parties as witnesses in the federal courts depends upon the acts of Congress as codified in this section. It is not derived from the statutes of any state, and is not subject to the condition and qualifications imposed by the state laws, nor is it subject to other exceptions and qualifications imposed by such state laws. King v. Worthington, 104 U. S. 44, 26 L. Ed. 652; White v. Wansey, 53 C. C. A. 634, 116 Fed. 345; Travis v. Ins. Co., 43 C. C. A. 653, 104 Fed. 486.

Finally, the exact condition of facts existing here arose and was determined under this statute in the case of Potter v. National Bank, 102 U. S. 163, 26 L. Ed. 111. The case was appealed from the Northern District of Illinois, in which state, as we have heretofore noted, this kind of testimony by its Supreme Court was held, under state statute, incompetent. The action was one brought by the bank against Potter, executor of Ward. On the trial Sturgiss, not a party to the suit, but interested in the issues to be tried, was allowed to testify to a conversation had by him with decedent, against objection, and the Supreme Court affirmed the ruling and held he was not disqualified, but competent. It is therefore very clear that I must wholly disregard the ruling of the Supreme Court of Appeals of this state to the contrary, and hold the evidence of these bank officers, directors, and stockholders to be perfectly competent in this court. So holding, a careful analysis of the testimony has led me to believe the facts here to be substantially as follows:

Decedent Russell was, prior to the year 1892, up to the time of his death in January, 1903, president of the Bank of Huntington, and of the Huntington National Bank, its successor. He was the largest stockholder, and actively in charge and control of its affairs. In 1892 the Huntington Distilling Company was organized as a corporation by Russell and four others, and in the course of its operations became indebted to the Bank of Huntington in various sums now aggregating near, if not quite, $10,000. The Bank of Huntington, a state institution, was merged into the National Bank of Huntington, and this paper indebtedness was taken over by the latter. This merger was made in the fall of 1903, and some time prior thereto, likely in the early part of the same year, the Huntington Distilling Company, of which Russell at the time was treasurer, by its president and secretary, executed a paper writing, not dated, in which it set forth its indebtedness to the Bank of Huntington in various sums of money, its desire to provide payment thereof, its ownership of about 7,600 gallons of brandy in bond at Huntington, in consideration of all which it thereby did "sell, transfer and deliver over to said bank all the proceeds of said brandy

aforesaid, together with all the book accounts of said Huntington Distilling Company." And it was further provided that "said bank is to have said accounts collected, and apply the proceeds thereof to the payment of its notes as aforesaid. And to sell said brandy and apply the proceeds arising therefrom to the further payment of said indebtedness." There is no question of the execution of this paper, and there can be no doubt of its delivery to Russell; how it was found, and where, is not very material, for, certain it is, I think, that no stockholder, director, or officer of the bank other than Russell knew of its existence until after his death in 1903. I regard the explanation made that it was found in his private papers in his private box in the bank when appraisement of the estate was made as at least reasonable and probable, but of one thing there can be no doubt, to wit, that Russell concealed absolutely from his fellow directors and stockholders of the bank the existence of this paper, and the bank's rights and interests in this personal property under and by virtue of its terms and provisions. Nor can there be any doubt of the fact that Russell took charge of the brandy and of the accounts of the distilling company, disposing of the first and collecting the second. The proceeds were not, however, paid by him to the bank, but were deposited therein to the credit of the distilling company, and withdrawn from time to time and paid out upon checks of the distilling company drawn to some extent by Worden, manager and in control, under Russell, of the property, and subject to his order, but mostly by Russell himself. These facts, it seems to me, refute the position so strenuously urged by counsel for the defendant that this paper was not delivered to Russell, and was not found as testified to by Oney, the cashier. If such paper was executed—and its mere execution, as I have heretofore said, is not denied—it is both possible, but strongly to be presumed, that Russell would be consulted and be fully informed of it. There were but three persons substantially interested in the distilling company, each having equal interest, each having subscribed $8,000 to the capital stock; the other two clearly were but nominal shareholders, having but one share each, and doubtless holding these only in order that the law requiring five shareholders as a prerequisite to incorporation and its maintenance might be complied with. Russell was one of the three, and he was at the time treasurer of the company. Its management was not naturally under his control, but under that of its president; but immediately after the execution of this paper, Russell, the treasurer of the distilling company and president of the bank to whom the property was sold and assigned, naturally took sole charge of it. The president of the distilling company has testified:

"At the time this statement was made from the books and accounts both were then in the possession of Mr. Russell, and I had no right under our agreement to collect any of these accounts, nor no one else had but Mr. Russell."

The last of the brandy was disposed of by him in 1898. The other officers of the bank during these years, however, had not been unsolicitous about the bank debts owing by this company. The matter had been discussed in the directors' meetings. At the time of the merger of the old bank into the new one, Russell had assured them the notes of the distilling company were good, and upon, doubtless, this repre-

sentation, they were taken over as such. When the Ceredo National Bank sued the company, these directors of the plaintiff put out their notes for suit, and a race was made by the two banks to secure priority of judgment, one by the regular action of debt, the other by statutory notice. The judgments of these banks were taken at the same term, the plaintiff's a couple of days before the others, but the one of the Ceredo bank was held to relate back to the first day of the term, while those of the plaintiff, taken by notice were held not to, so the Ceredo bank got priority in lien upon the real estate of the distilling company, as fully shown by the opinion in the case by the Supreme Court of Appeals. First Nat. Bk. Ceredo v. Huntington Distilling Co., 41 W. Va. 530, 23 S. E. 792, 56 Am. St. Rep. 878.

It further appears by the evidence in this case that a balance was realized from the sale of the company's real estate and was applied by the plaintiff bank to its judgments. While all this trouble, expense, and litigation was going on in the state court and the Supreme Court of Appeals, Russell remained silent and made no disclosure as to the assignment to the bank which he then held. All the satisfaction he gave his co-directors was the general statement to the effect that the property of the company was being disposed of and its accounts collected for the purpose of liquidating the debts due the bank. Why did he take this course? It seems to me that it is not necessary to harshly criticise his conduct under all the facts in the case. While I am constrained to hold that as a question of law his silence, his concealment of this paper, and his misdirection of the funds operate as a fraud upon the bank, yet his conduct, considered in the light of common experience, was not unnatural. The evidence discloses that he was a man of large means, with the very best reputation for honor and integrity; successful in business, and doubtless having the confidence of everybody. He was the largest stockholder and at the head of the oldest bank in his city. In this condition of life, and with a spotless reputation to maintain, he became interested in this unfortunate distilling company. He knew his connection with it had given it credit. He knew if it failed to pay its debts that, justly or unjustly, he must suffer in reputation and lose a measure of the public confidence which he then had. These considerations weigh heavily upon the minds of honest business men. He may have thought that it was absolutely necessary in order to make the most out of the property to get it out of the hands of his associates into his own, and this assignment to his bank may have been procured by him for this purpose. At the same time he may have felt that if it was revealed that he, while one of the three substantial stockholders and the treasurer of the company, had procured this assignment of all its property to the bank of which he was the largest stockholder and president, to the exclusion of other creditors, he must necessarily be charged with dishonesty and bad faith, and that litigation would doubtless ensue touching such assignment. These, I say, are plausible explanations for his silence and his manifest determination to take the whole matter into his own hands, work out the problem alone as best he could, and in the end personally protect his bank in any loss it might sustain. This, and this alone, it seems to me, can explain his remark to Enslow "that he supposed he was in such condition that he

would eventually have to pay the same" (these debts). In other words, he had failed, as successful business men even do sometimes, to straighten out the affairs of the distilling company and make its assets cover its liabilities, and as he had concealed the existence of the transfer of the brandy and accounts to the bank, had allowed, and even directed, the proceeds derived by him therefrom to be applied to the payment of other debts and obligations of the concern, he knew he was liable, and, like the inherently honest man that he was, he recognized his personal liability. He doubtless would have adjusted this matter with the bank sometime, had he lived. Nor is the administratrix, now that he is dead, to be criticised for making the vigorous defense she has to this action; for the law requires her, as a fiduciary, to plead these defenses of laches and limitation.

However, in charitably considering the conduct of Russell in this matter, we must not overlook the legal principles and deductions that must guide us in determining his liability for such conduct. Some of these deductions and principles may be thus stated:

First. This assignment, if it had been a general one on behalf of the distilling company to Russell to secure payment of its debts generally, would have justified his conduct in depositing the proceeds arising therefrom in his name as assignee of the distilling company, and, subject to the well-known limitations in regard to priority and equality, in checking out and paying said proceeds upon the expenses and debts generally. Under such conditions his co-directors of the bank would have been entitled to the same disclosure of the nature and terms of the assignment, of the progress made in carrying out its terms, no less, no more, than any other of the creditors, and would have had no other or different right than any other creditor to call him to a legal accounting for his acts.

Second. If, however, this assignment was not made to Russell himself but directly to the bank, and by its terms sold, transferred, and delivered over to said bank this brandy and the proceeds of these accounts, as it appears to me it clearly does, there can be no question that it was the plain duty of Russell, the moment the paper came to his hands, to call together the board of the directors of the bank and submit it to their consideration. This is true, I am confident, for several reasons: (a) Because it was their right to determine whether such assignment should be accepted by the bank, and the obligation assumed of defending it against legal assaults that might be made upon its integrity. (b) If accepted, it was their clear right to determine what disposition should be made of the assigned property. It was their distinct province to say what agent should be selected to sell and dispose of it for and on behalf of the bank, for I do not think it came within the general duties of Russell as president of the bank to make such sale and disposition without being so authorized by the directorate, any more than it would have been his general duty as such president, without special authority, to have sold the real estate, fixtures, or other property of the bank.

Third. Having concealed the existence of this assignment from his co-directors, having without their authority taken possession of said property and disposed of it under such conditions and without such au-

thority, he constituted himself a trustee de son tort for the bank, and must have been held, and his estate must now be held, to strict account for his acts in such trust relation.

Fourth. Trusts of this character being solely subjects of equitable jurisdiction under the common law, statutes of limitation were not applicable. In modern practice, while courts of equity will apply the statute of limitation in administering trust estates, it will in doing so look to all the facts and circumstances to ascertain whether equitable grounds exist against its strict enforcement, and, when such grounds do exist, will not hesitate to construe the case outside the bar, under the exceptions provided for by the statute itself, and by the dictates of equity and good conscience. Weinrich v. Wolf, 24 W. Va. 303.

Fifth. Under section 18, c. 104, of the Code (section 3511) of 1906 of West Virginia, express exception to the statute of limitations is made where the debtor absconds or conceals himself, "or by any other indirect ways or means, obstructs the prosecution of such right." And in the cases of Reynold's Adm'rs v. Gawthrop's Heirs, 37 W. Va. 3, 16 S. E. 364, Vanbibber v. Beirne, 6 W. Va. 179, and Thompson v. Whittaker, 41 W. Va. 574, 23 S. E. 795, this section has been construed. In the first case it is held, where a person by any indirect way or means osbtructs the prosecution of a right, the time during which such obstruction continues shall not be computed in the limitation periods. In the second case it is held, where it properly appears by the pleadings that the facts on which the cause of action was founded were exclusively in the knowledge of defendant, that he fraudulently concealed the facts, and that by such ways and means he defeated and obstructed the plaintiff from bringing his action within the time limited, the effect of the statute may be avoided in actions at law as well as in suits in equity. In the third case it is held:

"Under this section it requires some positive, affirmative act by defendant to operate under the.clause, or by any other indirect ways or means obstruct the prosecution of such right."

Mere silence will not do, but there must be some act designed to conceal the existence of its liability and operate in some way upon the plaintiff and prevent or delay suit for it.

Sixth. The defense of laches must necessarily be liberally upheld and applied by courts of equity, because its basic principle is to prevent oppression and injustice, so easy of perpetration where loss of written evidence, removal of witnesses, death of parties, and the numerous other like causes incident to life may wholly change conditions and render it impossible to know the right and truth of the matter. He who unreasonably delays his action until these conditions arise must lose his cause. In determining whether such delay is reasonable, the statute of limitations does not control, for a less period than the one provided by the statutory bar may, under given circumstances, be sufficient for this defense. While these principles are true, equity will allow no man, by his own fraudulent acts, by concealing paper contract or evidence necessary upon which to base an action against himself, to take advantage of delay occasioned by such conduct on his part. He who appeals to equity must come with pure heart and clean hands. It is true to-day,

as it was when Lord Loughborough decided Beaumont v. Boultbee, 5 Ves. 485, that no possible case can rightly stand under the beneficient administration of equity, wherein "a confidential agent and steward can impute neglect to his employer; for it is his duty to render an account and a fair account, to his principal and distinctly apprise him of the whole right he has. It is not for him to say that a person has been guilty of negligence whose negligence it was his duty to guard against with regard to his transactions with all persons, and particularly with himself."

Briefly applying these principles touching these two defenses relied on in this case, the one laches, the other of the bar of limitations, it is only necessary to say that it was Russell's clear duty as president of the bank, to see to it that the bank lost nothing by laches or limitation in bringing an action. He knew when he did not turn over the proceeds of this brandy and of these accounts to the bank that it had a cause of action against himself therefor, and it was his duty to do one of three things, either settle his liability, resign his directorship and presidency of the bank, or have himself at once sued by it. He did neither, but on the contrary he concealed the assignment, took possession of the property, and diverted to other uses its proceeds. The other bank officers learned this only after his death in 1903; they allowed his administratrix the year allowed by statute to settle the demand, and, when not settled, almost immediately brought this suit. Under such circumstances neither the statute of limitations nor the defense of laches can avail, but decedent's estate must be held liable for an accounting for the proceeds of the brandy and the accounts collected, less all necessary expenses incurred in the sale of the one and the collection of the other, and decree of reference to a master commissioner may be entered directing him to state this account.