## FINEFROCK v. KENOVA MINE CAR CO. et al.

Circuit Court of Appeals, Fourth Circuit.
November 9, 1927.

No. 2593.

**1. Corporations** ⬅197—**Pledgee of stock, without transfer on books, held not entitled to vote as stockholder.**

A creditor of a corporation, to whom stock of the corporation issued in its own name was pledged as collateral, but not transferred on the books, *held* not entitled to vote such stock as holder, nor to notice of stockholders' meetings.

**2. Corporations** ⬅519(1)—**Burden is on those who would sustain transaction between corporations having common directors to show their entire fairness.**

Where the fairness of transactions between corporations having common directors is challenged, the burden is on those who would sustain them to show their entire fairness.

**3. Trusts** ⬅231(2)—**Trustee in corporate mortgage not debarred from acquiring ownership of bonds secured.**

The mere fact that a bank is made trustee in a mortgage securing bonds of a corporation does not charge it with custody or control of the bonds evidencing the debt, nor preclude it from acquiring their ownership.

**4. Equity** ⬅427(1)—**Decree must be based on allegations of bill.**

Relief to complainant, not based on and authorized by the allegations of the bill, cannot be granted, even if it would be proper under the evidence, if the bill contained sufficient allegations.

**5. Appeal and error** ⬅1106(1)—**Case may be remanded for further proceedings without decision on merits.**

Appellate court has power, without determining and disposing of case, to remand it for further proceedings, if the case has been tried on a wrong theory, or the record is not in condition for the appellate court to decide the questions presented with justice to all parties concerned.

**6. Trusts** ⬅95—**Mortgagee of insolvent corporation, which bought its unmortgaged property at tax sale for much less than value, held to hold same on constructive trust for corporation.**

A bank held all the bonds of an insolvent manufacturing corporation secured by mortgage on all its property, except four machines. The vice president and cashier of the bank, who was also vice president, secretary and a director of the corporation, bought for the bank those four machines at sheriff's sale for taxes, for about one-third the price that had been offered for one of the machines by a responsible third party. *Held* that, except for a lien for the amount paid, the bank held the machines on a constructive trust for the corporation and its creditors.

Appeal from the District Court of the United States for the Southern District of West Virginia, at Huntington; George W. McClintic, Judge.

Suit in equity by James E. Finefrock against the Kenova Mine Car Company and others. Decree for defendants, and complainant appeals. Reversed and remanded.

Connor Hall, of Huntington, W. Va. (O. J. Deegan, of Huntington, W. Va., on the brief), for appellant.

Cary N. Davis, of Huntington, W. Va. (Fitzpatrick, Brown & Davis, of Huntington, W. Va., on the brief), for appellees.

Before PARKER, Circuit Judge, and SOPER and ERNEST F. COCHRAN, District Judges.

SOPER, District Judge. James E. Finefrock, a citizen of Ohio, and a judgment creditor of the Kenova Mine Car Company, brought a bill of complaint in equity in the District Court of the United States for the Southern District of West Virginia, against the mine car company and the First Huntington National Bank, West Virginia corporations, and G. D. Miller and H. S. King, trustee, citizens of that state. The suit was brought by the complainant, on behalf of himself and all other creditors of the mine car company, and related, in the first place, to a deed of trust in the nature of a mortgage conveying all the property of the company, except certain machines, to secure an issue of its bonds in the amount of $150,000. The trustee named in the deed of trust was the predecessor of the First Huntington National Bank, which, upon its organization, was vested with the powers and duties of the original trustee. For the sake of convenience the trustee in the deed of trust will be hereinafter referred to as the "bank," meaning thereby either the First National Bank of Huntington or its predecessor, as the case may be. Subsequent to the execution of the deed, the bank acquired the bonds themselves, in its individual capacity, and later, with the ultimate purpose of causing a sale of the mortgaged property, it filed a petition in the circuit court of Wayne county, West Virginia, praying for the appointment of a new trustee under the deed of trust, whereupon the defendant H. S. King was appointed trustee in its stead.

The bill of complaint was filed primarily to secure a decree restraining the sale of the mortgaged property, and canceling the deed of trust. The complainant rests his case on two grounds: (1) He charges that the deed of trust was invalid from its inception, because it was authorized at a meeting of stockholders illegally held; and (2) that the bank has been guilty of a breach of trust in its capacity as trustee, in that it has wrongfully converted all of the bonds to its own use in its individual capacity, notwithstanding the fact that the deed of trust was made for the benefit of all of the creditors of the company.

The bill of complaint also relates to certain machines of the company which were excepted from the deed. They were sold at a sheriff's sale for taxes, in the year 1925, and acquired in the name of G. D. Miller. This defendant was at one and the same time the vice president, secretary, and director of the mine car company, and also vice president, cashier, and director of the bank. The bill charges that, whether or not the machines were purchased by Miller, for the benefit of himself or of the bank, they were purchased under such circumstances that in equity they should be held to have been purchased for the mine car company. The bill prays for such relief as may be proper in the premises.

The separate answers of the defendant take issue with the bill in so far as it charges improper or illegal conduct in regard to the deed of trust, the bonds, or the machinery. It is admitted that the machinery was bought for the bank, and also that the bank intends to cause the trustee to sell the property covered by the deed of trust for its benefit.

The meeting of stockholders, at which the deed of trust was authorized, was held on June 27, 1922, in response to a notice for a special meeting to be held to consider and adopt means to furnish additional working capital for the company. A resolution was passed which authorized the board of directors to issue and sell bonds, with interest coupons, in a sum not to exceed $150,000, for the purpose of providing funds for the retirement of the outstanding indebtedness of the company, and of providing funds for general corporate purposes. On July 6, 1922, a special meeting of the board of directors was held, at which was passed a resolution that for the purposes mentioned in the stockholders' resolution of June 27, 1922, the officers of the company were authorized to issue and deliver to the bank, as trustee, bonds in the sum of $150,000, and that for the purpose of securing the bonds a deed of trust be executed and delivered to the bank as trustee, to be a first lien upon all

of the real estate and the machinery of the company in West Virginia, as described in the deed submitted to the meeting. The president of the company was further authorized to negotiate, sell, or pledge the bonds, when issued.

Accordingly, bonds in the sum of $150,000, and a deed of trust, dated July 10, 1922, were executed and delivered by the company to the bank. The deed of trust recites that the bonds were issued because the company desired to borrow money for the transaction and extension of its business, for the retirement of its outstanding indebtedness, and for the purpose of providing funds for general corporate purposes, and the acquisition of additional working capital. The property described in the deed was conveyed to the bank, its successors and assigns, in trust for the equal pro rata benefit and security of all the holders of the bonds secured by the indenture, and for enforcing payment thereof, when payable. It was provided that the bonds, upon the signing and execution thereof, should be duly certified by the trustee and delivered by it to the company. Until default by the company, it was agreed that the company should be suffered and permitted to have actual possession of the property, and to mortgage, borrow, and use the same; that, if the company should pay the principal and interest when it became due, then all the estate, right, title, and interest of the trustee should cease and determine, and the trustee should, by proper instrument in writing, release and discharge the deed of trust. Provision was also made that the trustee, in case of default, should become entitled to immediate possession of the property, with power to sell, without suit in equity or action at law, or with power to institute and carry out proceedings authorized by law for the enforcement of the deed. In other words, the deed of trust contained the usual provisions to be found in deeds of trust or mortgages executed to secure the payment of corporate bonds. It was nowhere provided in the mortgage that the bonds were issued for the benefit of all of the creditors of the company. The nearest approach to such a statement was the recital that amongst the purposes of the transaction was the retirement of the company's indebtedness.

[1] The complainant contends that the stockholders' meeting was invalid because he received no notice thereof. He claims that he was entitled to be notified, because he was at that time the holder of certain promissory notes of the company (later reduced to judgment), secured by preferred stock of the company deposited with him as collateral. The stock was registered and issued in the name of the company itself. The certificates provided that upon any question relating to the issuing of bonds by the company, or securing the same by mortgage or deed of trust upon its corporate property, the holders of preferred stock should be entitled to the same voting powers as belonged to the common stock. Therefore the complainant says that he was in effect the holder of certificates for the preferred stock of the company, and as such entitled to notice of the stockholders' meeting. It is clear that the point is not well taken. It is true that the stock was in the possession of the complainant, as pledgee; but he was not the owner of it, and was not the registered holder on the records of the company. Under these circumstances, he was not entitled to notice of the meeting, and could not have voted the stock, had he been present.

The complainant concedes that the correct rule under these circumstances is set out in 6 Fletcher, Cyclopedia on Corporations, p. 6667, § 3920, as follows: "Until the stock is transferred to the pledgee on the corporate books, he does not become a stockholder, and hence is not entitled to notice of corporate meetings which the statute requires to be given to stockholders. In the absence of statutory provision or agreement to the contrary, the pledgee of stock is entitled to vote the same at corporate meetings, if he appears as the holder of the stock on the books of the corporation, while the pledgor is entitled to vote the stock, if it continues to be registered in his name." See, also, Cook on Corporations (8th Ed.) vol. 3, §§ 596, 612; Thompson on Corporations, vol. 4, § 4237; 14 C. J. 904.

The statutes of West Virginia (see Barnes' Code, c. 53, §§ 18 and 19) provide that "the person in whose name shares of stock stand on the books of the corporation shall be deemed the owner thereof, so far as the corporation is concerned," and that "no vote shall be given on any stock while owned by the corporation, nor shall any stock while so held be entitled to any dividend." Hence it would appear that Finefrock was not entitled to notice of the stockholders' meeting, and that the stock held by him as collateral carried no voting privilege at the time. There is nothing at variance with this conclusion in the decision of this Court in Granite Brick Co. v. Titus, 203 F. 659, and 226 F. 557, for in that case the

stock was issued in the name of the pledgee, and there was an agreement that he should have the right to vote it.

The complainant, however, replies that the issuance of the certificates by the company to itself, and the indorsement and delivery of them to him, was equivalent to registry of the stock in his name. He relies upon the general rule that neither a transferer nor a transferee of stock will be prejudiced because no entry is made on the books of the corporation, or because the entry made is insufficient, where he has done all he could do to procure a transfer, and the failure is solely the fault of the corporate officers. 6 Fletcher, Cyclopedia on Corporations, p. 6327; Earle v. Carson, 188 U. S. 42, 44, 23 S. Ct. 254, 47 L. Ed. 373; Cecil National Bank v. Watsontown Bank, 105 U. S. 217, 26 L. Ed. 1039. The fact is, however, that the complainant in this case took no steps whatsoever to secure the issuance of the stock in his own name.

Prior to the formation of the Kenova Mine Car Company, he had been a stockholder of record of the Fulton-Kenova Mine Car Company, which conducted a plant at Kenova, W. Va., and also a plant at Canal Fulton, Ohio. It was determined to separate the properties. Accordingly two new corporations were formed, the Canal-Fulton Mine Car Company, to which the Ohio property was conveyed, and the defendant the Kenova Mine Car Company, to which the West Virginia property was conveyed. Stockholders in the parent company, in exchange for their interest therein, received certificates of stock in the new companies. Finefrock, however, was unwilling to accept the stock in the Kenova Mine Car Company, and so it was agreed that he should become a creditor of the defendant company and hold its stock as collateral security for the debt. Accordingly he was given promissory notes in the sum of $30,000, with preferred stock issued in the name of the company as collateral security. In short, the complainant by his own action became a creditor rather than a stockholder, and, although he became the pledgee of the stock to secure the debt, it does not appear that he desired to have the stock registered in his name, or that he made any effort whatsoever to accomplish it.

The complainant further contends that the deed of trust and the bonds issued thereunder should be canceled, because the bank was guilty of a breach of trust, in that it wrongfully converted to its own use property which it held in the capacity of trustee. The theory of the complainant is set forth in the bill of complaint. It is alleged that the purpose of those who took part in the meetings was that the bonds should be sold or pledged, and the proceeds applied to the payment of the debts of the company and to the further development of the business, and that the purpose of the issue was for the benefit of all of the creditors of the company; that the officers of the company executed and delivered the deed of trust to the bank, whereupon the bank, notwithstanding the purpose of the issue, undertook to assert ownership thereof and to convert all of the bonds to its own use. In other words, the charge in substance is that a trust, for the benefit of all the creditors, was imposed upon the bank under the terms of the deed, but that the bank, although accepting the trusteeship, diverted the bonds for the uses for which they were conveyed and wrongfully appropriated them.

There is no dispute as to what actually took place. The deed was executed on July 10, 1922, and delivered to the bank, together with the bonds. At or about the same time, the mine car company applied to the bank for an additional loan, and on July 27, 1922, the bank approved a new loan for $29,500, to be secured by the indorsement of the president of the company and by a deposit of the first mortgage bonds of the company in the sum of $150,000. The loan thereby granted brought up the sum total of the indebtedness of the company to the bank to the sum of $100,000, not including certain other loans secured by assigned accounts. The effect of this transaction, while providing the company with certain additional funds, was at the same time to give to the bank all of the company's property, except certain machines, as security, not only for the additional loan, but for the antecedent indebtedness.

It is pertinent to inquire what was the financial condition of the company at the time. The bill of complaint charges that the company was then insolvent. Insolvency is denied in the answers of the defendants. The complainant did not undertake to prove the charge, but considerable evidence taken on behalf of the defendant, if not sufficient to determine absolutely the issue of solvency, at least throws considerable light on the circumstances of the company. Witnesses for the defendants testified that in their opinion the company was solvent. They based their conclusions to a large extent on certain financial statements taken from the books of the company, from which it appeared, using

round figures, that the assets of the company were $603,000, and the liabilities $285,000, or an apparent surplus of $328.000. The statements, however, showed that fixed assets, consisting of land, buildings, machinery, equipment, and good will, were valued at $386,000; that the work in process, raw material, and store supplies were valued at $122,000; and that the current liquid assets, including cash on hand, notes receivable, accounts receivable, and trade acceptances, amounted to only $95,000. The buildings and machinery were such as were useful for the manufacture of mine cars.

A certain amount of the accounts receivable, not ascertainable from the record, had been already assigned to the bank as security for other indebtedness. The business of the company was in a bad way. It needed additional money to take care of certain merchandise creditors, to serve as working capital, and to purchase merchandise. From 1921 on, the mine car business was at a very low ebb, and the demand for mine cars was getting worse and worse. During the year 1922, the company was losing money all the time, and its condition became worse, until it quit about the end of 1923. It owed a large amount of debts, mostly for new equipment, and was being pressed by numerous creditors. When it received the additional loan of $29,500 on July 27, 1922, $3,500 thereof was used in payment of a note of the bank, $9,592.08 was used in paying 30 merchandise creditors, and the balance was used for pay roll purposes. On March 31, 1923, the annual meeting of stockholders was held, at which a plan was proposed for obtaining an extension of time for payment of creditors. It was proposed that debts under $100 be paid in cash, and that the claims of other creditors should be paid either in cash at the rate of 50 per cent., or in preferred stock of the company at par for the full amount. It is clear that in June and July, 1922, the company was not able to meet its obligations as they matured. For the purposes of this case, it is not necessary to determine whether the company was also insolvent in the sense that its property at a fair valuation was not equal in amount to its indebtedness. Obviously its solvency from this standpoint depended to a very large extent upon the proper valuation of its buildings and machinery. It lost some additional money after July 1, 1922, and at the time of the hearing of the case at bar was admittedly insolvent in every sense of the word.

The bank was in an unusually advantageous position to know the real condition of the company through the defendant G. D. Miller, the common officer of both corporations. He had also been treasurer of the Fulton-Kenova Mine Car Company, whose assets and liabilities at Kenova were taken over by the Kenova Mine Car Company. He was admittedly familiar with the assets and liabilities of the company. He was present at the stockholders' meeting of June 27, 1922, and acted as secretary thereof. He participated in the resolution directing the issuance and sale of the bonds. He took part in the directors' meeting of July 6, 1922, whereby the president was authorized to negotiate, sell or pledge the bonds. He signed the deed of trust of July 10, 1922, as secretary of the mine company and also as cashier of the bank. He continued as an officer and director of the company so long as it remained in business, and continues to be such until the present time, so far as the record in the case discloses. He has also continued to be an officer and director of the bank. It may also be noted in passing that the bank had other means of information of the company's condition. Michael Broh was a stockholder of the company, and attended the stockholders' meeting of June 27, 1922, which authorized the execution of the deed of trust. He was also a member of the discount committee of the bank, which on July 27, 1922, authorized the additional loan on condition that the bonds of the company should be pledged for the old as well as the new indebtedness. Broh became a director of the company on March 21, 1923.

It has been noticed that certain machinery belonging to the company was not covered by the deed of trust. The machinery consisted of two Greenlee boring machines and two Bliss presses, of 250 tons and 500 tons respectively. The presses cost $29,500, and the boring machines between $6,000 and $7,000. In March, 1925, after the company had ceased to do business, an offer was made to the president of the company by a responsible party to purchase the larger 500-ton Bliss press for the sum of $8,000. Both the company and the bank were then under the impression that this press was covered by the mortgage. Accordingly the president of the company communicated the offer to G. D. Miller of the bank, who took the position that the press should not be sold for that price. At or about this time the complainant learned for the first time of the execution of the deed of trust and the pledging of the bonds to the bank. He had an interview with Miller at the bank in April or May,

1925, during which it was discovered that the machines were not covered by the deed of trust. Subsequently the sheriff of West Virginia levied on the four pieces of machinery for unpaid taxes for 1924, amounting to something over $2,700. The sheriff's sale was had on June 6, 1925. Miller attended the sale and bought the machinery, in his name, but for the bank, for the sum of $2,800.

It is suggested by the bank that the knowledge of Miller as to the affairs of the mine car company was knowledge obtained by him individually in connection with his own private affairs, and not as agent of the bank. Undoubtedly notice to an officer of a corporation is not such notice to a corporation as to affect its rights, unless the knowledge of the officer concerns some matter coming within the sphere of his duty while attending to the business of the company. McDermott v. Hayes (C. C. A.) 197 F. 129. But there is little room for the contention under the circumstances of this case that the bank did not have actual knowledge of the condition of affairs. Miller's position as agent for both parties, and his participation in the common affairs of the two institutions, render any other conclusion impossible. It is true that he was not a member of the discount committee, which authorized the additional loan; but he took an active part in the company's affairs, as well as in those of the bank. The bank was the company's largest creditor. Considering the action which the bank took to secure for itself, in preference to all other creditors, by far the largest part of the company's assets, the inference is inevitable that its officers were aware of the company's distressing condition and were taking steps to safeguard the interests of the bank. Furthermore, there is no evidence on the part of the bank to the contrary. While we think that the bank comes within the general rule, and is affected with constructive knowledge of the facts in Miller's possession, we hold that in this case the bank had actual knowledge of what was going on.

[2] It follows that it is particularly fitting to scrutinize with great care the transactions between the two institutions. The rule is that the relation of directors to corporations is of such a fiduciary nature that transactions between boards, having common members, are regarded as jealously by the law as personal dealings between a director and his corporation. Where the fairness of such transactions is challenged, the burden is upon those who would maintain them to show their entire fairness. The Supreme Court has been consistently emphatic in the application of the rule, and has declared it to be founded upon the soundest morality and the soundest business policy. Geddes v. Anaconda Mining Co., 254 U. S. 590, 599, 41 S. Ct. 209, 65 L. Ed. 425. See, also, Hulings v. Hulings Lumber Co., 38 W. Va. 351, 18 S. E. 620, Sweeny v. Grape Sugar Refining Co., 30 W. Va. 443, 4 S. E. 431, 8 Am. St. Rep. 88.

Nevertheless, we cannot find that the complainant on this branch of the case has sustained the allegations of the bill of complaint. It has not been proved, as alleged in the bill, that the purpose of the bond issue was to benefit all of the creditors of the company. The real complaint of Finefrock is that the bank secured for itself practically all of the assets of the company, while the claims of all the other creditors were ignored. He contends that this conduct on the part of the bank, while it was trustee under the deed, was a violation of the terms of the trust. But it is clear that the deed is not a deed of trust for the benefit of creditors. It does not direct the trustee to sell or pledge the bonds, and to use the proceeds thereof for the benefit pro rata of the creditors of the company. It does declare that the company desires to borrow money, amongst other things, for the retirement of its outstanding indebtedness. This purpose, it is true, was not carried out, for the bonds were pledged, and not sold. Indeed, it was impossible to carry it out completely, for the sum total of the indebtedness exceeded $250,000, whilst the bond issue amounted to only $150,000.

Furthermore, this is not the only purpose mentioned in the deed. It comprehends as well providing funds for the transaction and extension of the business and for general corporate purposes. There is no declaration as to how much of the proceeds of the bonds is to be applied to any one of the purposes in view. Therefore we do not think that it can be said that the trust was established for the benefit of the creditors generally. Indeed, the duties of the bank as trustee were confined to the protection of such persons as should become owners of the bonds. It was under no obligation, as trustee, to see that the proceeds were used to reduce pro rata the claims of the various creditors. In short, we think that the allegations of the bill on this score have not been met. Moreover, we are not prepared to say that the use to which the bonds were put was outside the scope of the purposes outlined in the deed of trust. The company was hard pressed for money to pay merchandise creditors and to meet its pay rolls. It was able to raise enough money

to keep the business alive, provided it pledged its assets to the bank. It may have been unwise to make the deed of trust, but it cannot be said that the raising of money to meet the current obligations of the company was not within the scope of providing funds for general corporate purposes.

[3] Great emphasis is placed by the complainant upon the fact that the bank was trustee under the deed of trust and at the same time acquired a beneficial interest in the bonds as pledgee. But the mere fact that the bank was named as trustee in the deed of trust did not render it unlawful for the bank to accept the bonds as security for its debt. The trustee in a deed of trust to secure an issue of corporate bonds is charged with no custody or control of the evidence of the debt. His duty concerns the security alone, and the sale of the property in accordance with the terms of the trust in case of default. The rule that forbids the trustee from purchasing trust property has no application to his acquisition of the evidence of indebtedness in a transaction free from fraud. Whether a trustee, after a purchase of bonds, should continue to act as such and make sale of the property, is a question not involved in this case. Brewer v. Slater, 18 App. D. C. 48; Dennett v. Tilton, 227 Mass. 299, 116 N. E. 403.

Nevertheless we do not wish to give our approval in the present state of the record to the course of dealing between the company and the bank, and it may be that the complainant is not without a remedy. Numerous authorities hold that in the absence of statute, a preference, free from fraud, although made by an insolvent corporation, is valid, even if the effect of it is to deprive other creditors of a share of the debtor's assets. See the note to Union Coal Company v. Wooley, 19 A. L. R. 312. This seems to have been the rule in West Virginia prior to Acts 1891, c. 123, codified in Barnes' West Virginia Code as chapter 74, § 2. See Pyles v. Furniture Co., 30 W. Va. 123, 2 S. E. 909. On the other hand, a transfer of property by a debtor, although solvent, to one of his creditors, may be set aside, if it is made with intent to delay, hinder, or defraud creditors generally. Such was the rule prescribed by the common law and certain acts of Parliament, notably the statutes of 13 and 27 Elizabeth, which have been expressly re-enacted in similar terms in Virginia and many other states. Davis v. Turner, 4 Grat. (Va.) 422.

Barnes' West Virginia Code, c. 74, § 1, is as follows:

"Every gift, conveyance, assignment, or transfer of, or charge upon, any estate, real or personal, every suit commenced, or decree, judgment, or execution suffered or obtained, and every bond or other writing given, with intent to delay, hinder, or defraud creditors, purchasers, or other persons, of or from what they are or may be lawfully entitled to, shall as to such creditors, purchasers, or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor."

The decisions of the Supreme Court of the state interpreting such a statute control in a case of this kind. Bamberger v. Schoolfield, 160 U. S. 149, 16 S. Ct. 225, 40 L. Ed. 374; Brown v. Grand Rapids Furniture Co. (C. C. A.) 58 F. 286, 22 L. R. A. 817. It has been held by the Supreme Court of Appeals of West Virginia that the right of creditors under chapter 74, section 1, to set aside a fraudulent conveyance, does not depend on the insolvency of the debtor, although of course the financial condition of the grantor at the time of the conveyance is a circumstance to be considered. Halfpenny v. Tate, 65 W. Va. 296, 64 S. E. 28. There must, however, be a specific intent to delay, hinder, or defraud creditors. Lockhard v. Beckley, 10 W. Va. 87; Bowyer v. Martin, 27 W. Va. 442. The particular form of the instrument or act by which the unlawful conveyance is made is immaterial. Wolf v. McGugin, 37 W. Va. 552, 16 S. E. 797, construing chapter 74, § 2. An instrument in the nature of a preference, which does not disclose the real nature of the transaction, is generally deemed fraudulent. Fraudulent Conveyances, 12 R. C. L. § 99, p. 581.

Even if there is an actual indebtedness to be discharged or secured, the transfer will be held fraudulent if the transaction extends beyond the necessary purposes of a mere preference, so as to secure to the debtor some benefit or advantage or unnecessarily to hinder and delay other creditors. 27 Corpus Juris, § 385, p. 627, note 24. Similarly it has been held that a mortgage given by an insolvent person for a valid consideration, but withheld from record, by understanding or agreement, may be avoided at the suit of a trustee in bankruptcy, as property transferred in fraud of creditors, under section 70, National Bankruptcy Act (11 USCA § 110). National Bank v. Shackelford, 239 U. S. 81, 36 S. Ct. 17, 60 L. Ed. 158; Fourth National Bank v. Willingham (C. C. A.)

213 F. 219; In re Lamie Chemical Co. (C. C. A.) 296 F. 24; Crothers v. Soper (C. C. A.) 10 F.(2d) 793. See, also, Reynolds v. Gawthrop, 37 W. Va. 3, 16 S. E. 364. In United States Rubber Co. v. American Oak Leather Co., 181 U. S. 434, 21 S. Ct. 670, 45 L. Ed. 938, the corporation gave a preference for an antecedent indebtedness by giving confessed judgment notes for it and for a new loan. The preferred judgment creditors were given control of the corporation so as to prevent the debtor from giving a like advantage to other creditors. The Supreme Court held that such a device was not permissible, unless it was put in the form of a mortgage or other instrument perpetually open to inspection upon public records.

In passing, it may be noted that there is some indication in the record that officers of the company, who had indorsed its notes in the hands of the bank, were released from their indorsements when the bonds were pledged. If this is the case, it may have some bearing upon the validity of the transaction. See 19 A. L. R. 334, 350 to 352. But the evidence on the point is too vague to permit an expression of opinion.

Bearing in mind the well-established rules in regard to fraudulent conveyances, it becomes clear that, although the transfer of the bonds to the bank was within the broad language by which the purposes of the trust were described in the deed, it is still pertinent to inquire whether the parties to the deed did not intend to hinder, delay, or defraud the other creditors, when the bonds were executed and delivered to the bank as security for an antecedent indebtedness. The true character of this transaction was not disclosed to the creditors by the conveyance which was recorded. One who read the deed of trust would naturally assume that the main purpose of the company was the acquisition of new money, in order, not only to retire its outstanding indebtedness, but also to extend its business. No one would suppose that the company was in failing circumstances, or that the actual purpose was to transfer all of the bonds to the bank as security for the existing debt and for a new loan of only $26,000.

The obscurity was the more complete by reason of the appointment of the bank as trustee in the deed of trust. It was not unlawful for the bank to acquire a beneficial interest in the bonds; but no one would infer from the deed that it was the intention of the parties that the trustee named in the instrument should acquire for itself a lien upon the entire issue. It may well be that not only the interests of the bank were promoted, but the other creditors were lulled into a sense of security by the form which the transfer took. If the purposes of the parties had been fully revealed, other creditors could have more readily ascertained the financial condition of the company, and might have been led to test its solvency in some proceeding in a state or federal court before the period should have elapsed during which a preference might be set aside.

[4] Nevertheless we make no finding on the point. The bill of complaint was not based upon the West Virginia statute, and it was not considered by the parties either in their pleadings or in their arguments at the bar. An express trust for the benefit of all the creditors was alleged, but this claim was not supported by the proof. It would be improper in our opinion to base a decree in this case on the West Virginia statute, when the defendants were brought into court to answer a very different charge. It is well settled that relief to the plaintiff, not based upon and authorized by the allegations of the bill, cannot be granted, even if it would be proper under the evidence, if the bill contained sufficient allegations. 21 Corpus Juris, § 855, p. 673; Eyre v. Potter, 15 How. 41, 14 L. Ed. 592; Dashiell v. Grosvenor (C. C. A.) 66 F. 334, 27 L. R. A. 67; Andrews v. Farnham, 10 N. J. Eq. 91; Marshman v. Conklin, 21 N. J. Eq. 546; Garrett v. Louisville & Nashville R. Co., 235 U. S. 308, 35 S. Ct. 32, 59 L. Ed. 242; Reynolds v. Stockton, 140 U. S. 254, 11 S. Ct. 773, 35 L. Ed. 464.

[5] We think that the proper action on this branch of the case is to remand it without final decision to the District Court for further proceedings, in which, if the parties desire it, the pleadings may be amended, additional evidence may be taken, and the defendants may have full opportunity to present their defense. There is abundant authority for the proposition that the appellate court has power, without determining and disposing of a case, to remand it to the lower court for further proceedings, if the case has been tried on a wrong theory, or the record is not in condition for the appellate court to decide the questions presented, with justice to all the parties concerned. Combs v. Hodge, 21 How. 397, 16 L. Ed. 115; Wiggins Ferry Co. v. Ohio & Miss. R. Co., 142 U. S. 396, 12 S. Ct. 188, 35 L. Ed. 1055; Jones v. Meehan, 175 U. S. 1, 20 S. Ct. 1, 44 L. Ed. 49; N. Y. Central & H. R. Co. v. Beaham, 242 U. S. 148, 37 S. Ct. 43, 61 L. Ed. 210; U. S. v. Rio Grande Dam Co.,

184 U. S. 416, 423, 22 S. Ct. 428, 46 L. Ed. 619; Rio Grande Dam & Irrigation Co. v. U. S., 215 U. S. 266, 275, 30 S. Ct. 97, 54 L. Ed. 190; U. S. v. Shelby Iron Co., 273 U. S. 571, 47 S. Ct. 515, 71 L. Ed. 781.

[6] Coming now to that portion of the case which relates to the Bliss presses and Greenlee boring machines, we have no doubt that, under the bill of complaint and the evidence, the complainant is entitled to relief. It is true that the bill of complaint is vague in this particular, but it does allege that the defendant Miller purchased the machines at the sheriff's sale under such circumstances that he should, in equity, be held to have purchased them from the mine car company. The answers of the defendants admit the purchase, but claim that it was lawfully made by Miller for the benefit of the bank. The evidence indicates that the parties were apprised of the nature of the charge, and there is no suggestion that there is other evidence not before the court which might throw additional light upon the transaction. The undisputed facts have already been set out. It is not denied that, when Miller purchased all four of the machines on June 6 at the sheriff's sale for $2,800, both he and the president of the company had been advised that a responsible corporation was willing to give $8,000 for the larger Bliss press. No explanation is vouchsafed, either by the bank or the mine car company, as to why the company permitted the sale of all of the machines to the bank for a much smaller sum. Not only did the company fail to take any action to bid at the sale, or to have the sale set aside, but it makes no reference to the transaction in its answer to the bill of complaint filed in this cause by the same attorneys who represent the bank.

We do not think that in equity or good conscience the bank should retain title to the machines. The most to which it is entitled is a lien uopn the machines for the amount paid therefor at the sheriff's sale. Except for this claim, we are of the opinion that the bank holds the machines upon a constructive trust for the benefit of the mine car company. Boyd v. Hankinson (C. C. A.) 92 F. 49; Huntington National Bank v. Huntington Distilling Co. (C. C.) 152 F. 240; Sunny Brook Zinc Co. v. Metzler (D. C.) 231 F. 304; Iroquois Iron Co. v. Kruse (C. C. A.) 241 F. 433. The pleadings in this cause should be amended, so as to pray for the appointment of a receiver, and a sale of the property should be had, so that, after taking care of the claim of the bank, the balance of the proceeds from the machines may be paid to the general creditors.

It has already been shown that the insolvency of the company at the present time is admitted. If it should appear, in the further proceedings to be had in this cause, that the deed of trust should be set aside, and the pledge of the bonds vacated as constituting an act to hinder, delay, or defraud the creditors, then it will be proper for all of the assets of the company to be placed in care of the receiver, to be sold for the benefit of creditors, under the direction of the court. In such event the bank should be allowed to participate in the distribution as a secured creditor for the additional cash advanced on July 27, 1922, and as a common creditor for the balance of its claim.

The costs in this appeal will be equally divided between the parties. Reversed and remanded for further proceedings, consistent with this opinion.

Reversed and remanded.